[Cite as *Darden v. Fambrough*, 2013-Ohio-5583.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 99730

---

## AJA DARDEN, ET AL.

### PLAINTIFFS-APPELLEES

vs.

## WILLIAM FAMBROUGH

### DEFENDANT-APPELLANT

---

### JUDGMENT:
### REVERSED AND VACATED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case Nos. CV-793630 and CV-793631

**BEFORE:** Stewart, A.J., S. Gallagher, J., and E.A. Gallagher, J.

**RELEASED AND JOURNALIZED:** December 19, 2013

**ATTORNEYS FOR APPELLANT**

Robert C. Petrulis
Kelly L. Hamilton
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
127 Public Square
4130 Key Tower
Cleveland, OH    44114


**ATTORNEY FOR APPELLEES**

Denise J. Knecht
4415 Euclid Avenue, Suite 310
Cleveland, OH    44103


**ATTORNEYS FOR AMICUS CURIAE, BOARD OF TRUSTEES, EAST CLEVELAND LIBRARY**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY:    Brian R. Gutkoski
Assistant County Prosecutor
The Justice Center
1200 Ontario Street, 8th Floor
Cleveland, OH    44113

MELODY J. STEWART, A.J.:

{¶1} The court issued petitioners-appellees Rose Ford and Aja Darden, the interim executive director and fiscal officer, respectively, of the East Cleveland Public Library, temporary protection orders against respondent-appellant William Fambrough, the president of the Board of Trustees of the East Cleveland Public Library, on grounds that Fambrough had harassed them and threatened to fire them. During a hearing on the combined petitions, the court, fearing that Fambrough might take retaliatory action against the petitioners, told him that he could not convene an executive session of the board of trustees without first giving the court notice. Fambrough did convene an executive session of the board without giving the court notice and the board terminated the petitioners, so the court found him in contempt and ordered him to pay Ford and Darden's attorney fees.

{¶2} In seven assignments of error, Fambrough challenges the jurisdiction of the trial court, the validity of the court's orders, complains about the lack of due process, and disputes the amount of fees awarded. We conclude that the court lacked jurisdiction over Ford's case because there was no order consolidating that case with Darden's case. But that error is inconsequential because the court erred by issuing temporary, ex parte civil stalking protection orders in what appears to be an employment dispute between the parties. Even if a civil protection order could have been granted under the circumstances, we conclude that the court had no authority to use it to limit Fambrough's

exercise of his duties as a trustee when those duties did not relate to the safety or protection of either Ford or Darden, so there was no legal basis for holding Fambrough in contempt.

I

{¶3} Darden and Ford filed separate petitions for temporary protection orders: Darden's case, CV-793630, was assigned to Judge Richard McMonagle; Ford's case, CV-793631,was assigned to Judge Michael Russo. After each judge separately issued the protection orders at issue, Judge McMonagle assumed jurisdiction over CV-793631. At the time, there was no order consolidating the cases. Fambrough objected to Judge McMonagle asserting jurisdiction over Ford's case.

{¶4} Petitions for temporary protection orders can be filed in the name of one person only. *See* R.C. 2903.214(C) ("A person may seek relief under this section * * *."). In the ordinary practice, the court can consolidate actions involving "common questions of law and fact." *See* Loc.R. 15(H) of the Court of Common Pleas of Cuyahoga County, General Division. However, consolidation must be accomplished by way of a properly signed and filed journal entry. *See State ex rel. Hexagram v. Friedland*, 8th Dist. Cuyahoga Nos. 87089 and 87105, 2005-Ohio-6764, fn. 3 ("The reassignment of any case to a judge must be accomplished through a journal entry that has been executed by the administrative judge and journalized by the clerk of the trial court."). Judge McMonagle exercised jurisdiction over Ford's case without a signed and journalized judgment entry reassigning the case to him, so any ruling he made relating to

Ford was voidable on objection. *See In re J.J.*, 111 Ohio St.3d 205, 2006-Ohio-5484, 855 N.E.2d 851, paragraph one of the syllabus.

{¶5} The record does contain an order signed by Judge Russo and filed on January 8, 2013, transferring Ford's case to Judge McMonagle, but that entry was made too late because Judge McMonagle had, on the very same day, found Fambrough in contempt. In any event, Judge Russo could not validly enter a transfer order because Loc.R. 15(H) states that the judge who has the lower case number shall rule on a motion for consolidation. Judge McMonagle had the lower case number, so any order of transfer would have been his responsibility.

{¶6} Ford argues that Judge Russo's order was functionally a nunc pro tunc order, but this argument misapprehends the purpose of an order nunc pro tunc. "A 'nunc pro tunc' entry is used retrospectively to correct clerical errors in a judgment so that the judgment reflects that which the court intended." *Kennedy v. Jacobs*, 8th Dist. Cuyahoga No. 98285, 2012-Ohio-4604, ¶ 3. In other words, for an order to be nunc pro tunc (literally "now for then"), it must refer to a previous judgment or order and state what was omitted from that previous judgment or order.

{¶7} There was no prior order of consolidation or anything remotely touching on the issue of consolidation, so Judge Russo's January 8, 2013 order transferring Ford's case to Judge McMonagle could not have been nunc pro tunc to an earlier date. Judge Russo's transfer order would have been effective moving forward from its date of issue, but it could not validly reach back in time to vest Judge McMonagle with jurisdiction

over the *Ford* case.    It follows that any orders Judge McMonagle made in the *Ford* case before the transfer was effected are void.

## II

{¶8} The court's error in proceeding in Ford's case is inconsequential, however, because we conclude that the court erred by issuing temporary civil protection orders in the first instance for what was an employment dispute between the parties that did not involve any immediate and present danger to the petitioners.

## A

{¶9} R.C. 2903.214(C) states that an application for a civil protection order must contain an allegation that the respondent engaged in menacing by stalking.   Menacing by stalking, as defined in R.C. 2903.211(A)(1), states:   "No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person."   In order to issue a temporary, ex parte protection order, the court must find that the order is necessary "for the safety and protection of the person to be protected by the order."   R.C. 2903.214(D)(1).   The statute states that "immediate and present danger" to the person to be protected is good cause for issuing the order and that "immediate and present danger" includes situations "in which the respondent has threatened the person to be protected by the protection order with bodily harm."   *Id.*

## B

{¶10} Neither petitioner gave either judge adequate grounds for the issuance of the civil protection orders.

{¶11} Darden's petition stated:

On 8/20/2012, Respondent stated the victim has been making [sic] fraudulent activities. Respondent has been putting his finger in the victim's face. On 10/11/12 Respondent demanded a signature plate. Respondent followed the victim into her office telling her to quit.

{¶12} Ford's petition for a protection order made this single allegation:

In May 2012, the Respondent told the victim that she could lose her job if she did not cooperate with him as chairman of the board. Respondent has been harassing her to release sensitive information he is not entitled to.

{¶13} It does not appear that the court conducted an ex parte hearing on Darden's petition. The court did conduct an ex parte hearing on Ford's petition.[1]

{¶14} The allegations made by both petitioners arose from an internecine dispute between the board of trustees of the East Cleveland Public Library and the library's administrative staff. It appears that a turnover in the board of trustees led to Fambrough being named president of the board. Ford, who had been appointed interim executive director by the outgoing board of trustees, said that some six months after Fambrough assumed his duties as president of the board, he and two other board members had a

---

[1] Ford's petition was originally assigned to Judge Russo, however the official transcript indicates that Judge McMonagle conducted the ex parte hearing on Ford's petition. The parties appear to agree that Judge Russo conducted the ex parte hearing on Ford's petition and that Judge McMonagle's name appeared on the transcript because he subsequently asserted jurisdiction over the case. We have no reason to disbelieve the parties, but in the absence of a formal request to amend the record we are bound by the transcript certified to us.

conversation with her to the effect that it would "be in [her] best interest" to do what Fambrough told her to do, or else "[her] job would be in jeopardy." From that point, Ford's relationship with Fambrough deteriorated and Fambrough blocked all attempts to have her appointed as the permanent director of the library.

{¶15} Ford's relationship with Fambrough grew antagonistic after Fambrough requested information on a library employee that had been terminated. According to Ford, that employee was a friend of Fambrough's and he apparently wanted Ford to give him documents from the friend's personnel file. Ford refused "because there was a lot of sensitive information in there and if anything got out, [she] didn't want to be accused of putting her business out there." She said that Fambrough continually called her after that until the terminated employee gave her consent for Ford to release the file to Fambrough. That "upset" Ford because she believed that Fambrough circumvented board policy relating to grievances.

{¶16} Ford told the court that Fambrough had been "immediately in my face, name calling, referring - asking me to leave, to get out, to quit my job, and his behavior becomes more and more aggressive. I am being bullied." When asked to describe the incidents in which Fambrough had been "in her face," Ford told the court that one occurred during a library community forum where "he got directly in my face and pointed and demanded I make copies of a document that was not related to the meeting, and that day he yelled at me across the room in front of everybody * * *."

{¶17} Another incident happened when Fambrough was following Darden into her office and Ford stated that "[I] put my arm out because he was going to follow Ms. Darden into her office and I said, * * * – you shouldn't do that." Ford said Fambrough was "directly up on me" and "got in my face." He refused her requests to leave and called her a "scary ass or something to that nature." She said she called security to have him removed. She said "this last incident was the most aggressive."

C

{¶18} The common theme with both petitioners was that Fambrough had used his position as president of the board of trustees to seek information that they did not believe he was entitled to receive, and that he threatened their jobs when they refused to comply. Threatened job loss is not a basis for issuing a protection order because it does not involve an immediate and present danger of bodily harm.

{¶19} At no point did either petitioner claim that Fambrough had caused them any physical harm or threatened to do so. The only allegation that either petitioner made that touched on the issue of physical harm was that Fambrough put his finger in one's face (Darden) or that Fambrough had been "in her [Ford's] face." Ford conceded to the court that Fambrough had "never struck me * * * or put his hands on me[.]"

{¶20} We likewise find that neither petitioner alleged the kind of mental distress necessary to show that Fambrough engaged in menacing by stalking. Ford's primary complaint was that Fambrough had "bullied" her by yelling at her and was abusing his position as president of the board of trustees. She said that "I have been consistently

harassed and threatened by Mr. Fambrough. He makes unreasonable demands. He's threatened my job position if I don't fully cooperate with him." Ford said that Fambrough had been "immediately in her face," asking her to quit her job. She claimed that his actions were becoming more aggressive and that when she refused to give him materials that "did not belong to him but that were the property of the library, [he] got immediately in my face and demanded that I give it to him." She said he was "yelling and screaming" at her in front of other people and refusing to leave her office when requested. She described him as "bullying" and that in meetings he "smirks" at her or would "look at [her] and make nasty faces."

{¶21} In one specific instance of receiving what she claimed was a "menacing" telephone call, Ford said that Fambrough called her on a Saturday to complain that she had not immediately reported a system malfunction to him. However, when pressed by the court as to how she found that "threatening," Ford conceded "I guess that's not threatening but it was just part of the whole picture." She went on to say that "he was bullying me on that phone. His tone of voice, his nature, he was exercising authority and threatening me that this better not happen again because * * * [w]hen things happen at this library, I'm the first person who needs to know."

{¶22} The court concluded that Fambrough's actions amounted to "bullying," but even if we agreed with that characterization of his conduct, it did not rise to the level of a criminal offense sufficient to warrant judicial intervention in the form of a protection order. The courts are not arbiters of civility in the workplace. *Oncale v. Sundowner*

*Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). In the context of the tort of intentional infliction of emotional distress, the courts have recognized that civil "liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" and that persons "must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 6 Ohio St.3d 369, 372, 375, 453 N.E.2d 666 (1983).

{¶23} The menacing by stalking statute thus requires the petitioner to show something more than allegations describing a boorish and overbearing supervisor whose conduct was purely work-related. *Darling v. Darling*, 7th Dist. Jefferson Nos. 06 JE 6 and 06 JE 7, 2007-Ohio-3151, ¶ 22 ("It is not at all clear, though, that merely rude gestures or snide remarks to another person constitute menacing by stalking, and by extension, justify issuing a civil stalking protection order."). Neither petitioner alleged that Fambrough's conduct amounted to an immediate and present danger that he would cause either of them physical harm or mental distress of the kind required to show menacing by stalking. The "threats" that Fambrough made to them were nothing more than job-related consequences should they fail to obey his directives. Issuing a protective order in the context of a heated employment dispute not only demeans the seriousness of the kind of conduct that warrants a protection order, but needlessly puts the court into employment disputes that are beyond its expertise. *Chandler v. Dunn*

*Hardware, Inc.*, 168 Ohio App.3d 496, 2006-Ohio-4376, 860 N.E.2d 1042, ¶ 23 (8th Dist.) ("The courts understandably avoid becoming entangled in discussions about the wisdom of business decisions and do not require good business judgment on the part of business executives.").

{¶24} The court appeared to issue the protection orders because it was concerned that Fambrough would take unwarranted disciplinary action against the petitioners. To be sure, the court repeatedly stressed to Ford that "I'm not putting myself in the middle between you and the board" and that if the board was to follow "proper procedures and they replace you as interim director, then that's one way that they resolve this issue." The court's subsequent actions belied this assertion.

{¶25} When the parties met before the court after the ex parte protection orders had been issued, the court noted that both Darden and Ford had filed complaints with the Ohio Civil Rights Commission and that it would "defer to that[.]" The substance of those complaints is not in the record. The court then warned Fambrough that if he wished to call a meeting of the board of directors, the meeting had to be "duly called" and that the board could not go into an executive session without first giving notice. Apparently concerned that Fambrough would act in a retaliatory manner against the petitioners, the court told Fambrough: "If you have a private meeting, executive session meeting, without notice, I want to know about it. You're not to do it. You can't have a secret meeting, all right?"

**{¶26}** It is beyond question that by the time the court warned Fambrough not to hold any executive session of the board without giving notice to the court, the court was no longer concerned with any imminent and present danger to the petitioners of the kind necessary to issue a civil protection order. Contrary to its earlier assertions to Ford, it had placed itself squarely in the middle of an employment dispute and was using the protection order as a functional restraining order. Simply put, the court's action was an extension of its intent to stop Fambrough from taking retaliatory action against the petitioners.

**{¶27}** To the extent the court believed that Fambrough was "bullying" the petitioners, it was apparent that he did so by asserting his authority over them as a supervisor (it appears that both Ford and Darden answered directly to the board of trustees). Fambrough may have done so in a manner that the petitioners found particularly offensive, but his actions did not amount to menacing by stalking. As previously noted, if Fambrough's actions would not rise to the level of the civil tort of intentional infliction of emotional distress under the lower burden of proof employed in civil actions, they could not constitute the crime of menacing by stalking for purposes of issuing a protection order under R.C. 2903.214. We therefore conclude that neither petitioner offered a sufficient reason for the court to issue the protection orders.

III

**{¶28}** Even if we could have found the protection orders to be justified as protecting the petitioners' safety, the court made no formal order prohibiting Fambrough

from calling the board into an executive session without giving the court prior notice, so there was no valid order that he could be found to have disobeyed. And even had the court journalized its directive that Fambrough not call the board into an executive session without first notifying the court, that order was beyond the court's authority because it inhibited Fambrough's discretion in carrying out his duties as president of the library's board of trustees without any showing that Fambrough's actions would implicate the safety and protection of the petitioners.

A

{¶29} R.C. 2903.214(D)(1) permits the court, for good cause shown, to "enter any temporary orders" that are "necessary for the safety and protection of the person to be protected by the order." Although this section does not state what orders the court might make, it plainly does limit orders to those relating to a petitioner's safety and protection.

{¶30} To the extent the court "ordered" Fambrough to give it notice before conducting any executive session of the board, that order was of no effect because it was not journalized. The court speaks only through its journal, *State ex rel. Worcester v. Donnellon*, 49 Ohio St.3d 117, 118, 551 N.E.2d 183 (1990), so unsigned or nonjournalized orders are unenforceable. So in fact, the court did nothing more than order that its previous orders of protection remain in effect. Those protection orders only required Fambrough to keep a minimum distance from the petitioners. The court's verbal warning that Fambrough provide it with notice before taking the board of trustees into an executive session was stated ten days after the protection orders were put in place,

so the warning was in addition to the journalized protection orders. With there being no valid journal entry requiring Fambrough to give the court notice, Fambrough had no legal obligation to comply. The court had no authority to find him in contempt for violating an nonjournalized order. *Csaky v. Csaky*, 9th Dist. Summit No. 10776, 1982 Ohio App. LEXIS 11485 (Dec. 8, 1982).

B

{¶31} If the court had issued a valid order that Fambrough give it notice of any executive session to be conducted by the board of trustees, such an order would have been beyond the scope of the court's authority.

{¶32} The court could not, in the context of a hearing for a protection order, issue any orders that restrained Fambrough in the exercise of his duties as president of the board of trustees unless those orders were directly related to the purposes of R.C. 2903.214(D)(1) and intended for the safety and protection of the petitioners. By the time the court demanded that Fambrough give it notice before calling the board into an executive session, the petitioners had been under a protective order for at least ten days. There was no indication that Fambrough had violated the protection order by making any physical threats against them or had caused them mental distress rising to the level of a crime. So there was no basis for the court to conclude that an executive session of the board of directors posed an immediate and present danger of the kind contemplated under R.C. 2903.214(D)(1).

**{¶33}** The only conclusion to be reached on the record before us is that the court was trying to prevent the board of trustees from acting in secret to terminate the petitioners. Regardless of whether the board of trustees might retaliate against the petitioners by terminating them, termination from employment did not invoke the kind of conduct to be prevented by the issuance of a civil protection order. That being the case, the court's requirement that Fambrough give it notice before convening an executive session of the board did not derive from any need to protect the petitioners as contemplated by R.C. 2903.214(D)(1). The board's decision to meet in executive session was an act within their discretion, and the court overreached its authority by attempting to limit the board's exercise of discretion that did not relate to any imminent or present danger of bodily harm. It follows that Fambrough could not be held in contempt for violating an order that the court had no power to issue. *See In re Guardianship of Jadwisiak*, 64 Ohio St.3d 176, 184, 593 N.E.2d 1379 (1992). The contempt citation must be vacated.

**{¶34}** This cause is reversed and the order of contempt is vacated.

It is ordered that appellant recover of appellees his costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

MELODY J. STEWART, ADMINISTRATIVE JUDGE

SEAN C. GALLAGHER, J., and
EILEEN A. GALLAGHER, J., CONCUR